No. 2196

Second Circuit Appeal

MRS. ELLA GREGORY ET AL. v. LOUISIANA CENTRAL LUMBER CO.

(May 9, 1925, Opinion and Decree.)

*(Syllabus by the Editor.)*

1. **Louisiana Digest—Master and Servant—Par. 154.**

Where, under Act No. 251 of 1920, a mother appointed guardian in Mississippi filed in evidence her appointment containing special authority to sue for minors, she has complied with the law.

2. **Louisiana Digest—Appeal—Par. 625.**

In a suit under the Employers' Liability Act No. 20 of 1914, the question of fact as to whether injured employee's fall was caused by intoxication, decided by the trial judge, will not be disturbed, it being clearly correct.

Appeal from Thirteenth Judicial District Court of Louisiana, Parish of Caldwell, Hon. F. E. Jones, Judge.

This is a suit to recover compensation under Act No. 20 of 1914 for the death of a son and a brother.

There was judgment for plaintiffs and defendant appealed.

Judgment affirmed.

Long & Crow, of Shreveport, attorneys for plaintiff, appellee.

Thornton, Gist & Ritchie, of Alexandria, attorneys for defendant, appellant.

STATEMENT OF THE CASE.

REYNOLDS, J. In this case Mrs. Ella Gregory and her three minor children file suit against Louisiana Central Lumber Company under the workmen's compensation law of Louisiana for the death of Pinkney Gregory son of Mrs. Gregory and brother of the three minors—Flossie, Iva and T. J. Gregory—named as co-plaintiff with their mother.

Petitioners claim that Pinkney Gregory came to his death from an injury caused by a fall which he received while in the discharge of his duties as an employee of defendant as a brakeman on a train of the Louisiana Central Lumber Company.

Defendant denied liability and claimed that deceased was not severely injured by the fall he received and did not die from the effects of said fall; and in the alternative claimed that said fall was the direct result of and due to and caused by his intoxication.

Defendant filed an exception to the right of the minors to appear in court through their mother, Mrs. Ella Gregory.

On these issues the case was tried and there was judgment for plaintiffs and defendant has appealed.

Defendant in its brief stresses its exception to the right of minors Flossie, Iva and T. J. Gregory to file this suit.

Plaintiff, Mrs. Gregory, mother of the minors, filed in evidence her appointment in Mississippi as the guardian of these minors containing special authority for her to sue for said minors.

Act No. 251 of 1920 provides that any person who has been or shall be appointed Tutor or Guardian of any minor residing out of the State of Louisiana and who has qualified as such in conformity with the laws of the state or country where the appointment was made, upon his producing satisfactory evidence of his appointment as aforesaid he shall be entitled to sue for and recover any property, rights and credits belonging to the minor in this state.

Under this law, the exception could not properly be sustained.

### ON THE MERITS

The first question to be decided is whether or not the defendant died from the effect of injuries received in the fall.

The only testimony on that point is that of Doctors Joyner, Gardner and Kennedy.

Dr. A. J. Joyner, camp physician of the defendant company, testified as to the cause of defendant's death (page 44):

"Q. Did you make an examination of his body where he complained of the pain?
"A. Yes, sir, but I could not find any external evidence of an injury at that time.
"Q. How many examinations did you make?
"A. Two.
"Q. When did you make the next examination?
"A. After he died.
"Q. In connection with who else did you make the examination?
"A. Dr. Gardner.
"Q. Did you at that time find any evidence of external injury?
"A. On his right hand and right arm.
"Q. What kind of evidence did you find on his right hand and right arm?
"A. A very slight bruise.
"Q. Did you find any evidence of a bruise on his side?
"A. No, sir."

Dr. E. D. Gardner, head physician and surgeon of defendant company, testified (page 50).

"Q. Did you find any bruises or signs of injury on his body?
"A. I found nothing that I would call bruises, simply dark spots on the right side of the body.
"Q. Did you find the dark spots on the right side of the body?
"A. Yes, sir.
"Q. Doctor, to refresh your memory, I have a report here from yourself and Dr. Joyner. I will ask you to examine that and state if you saw any dark spots on the body and if so where?
"A. I found these on the right side of the body, arm, leg and shoulder as well as I remember.
"Q. You didn't make any notes on it?
"A. No, sir.
"Q. Did you examine him for the purpose of trying to find out what caused his death?

"A. I examined him for the purpose of trying to find out whether he received any injury."

Dr. A. E. Kennedy, a physician of McGee, Mississippi, the place, to which the remains of deceased were shipped, testified (page 37):

"Q. When did you last see Pinkie Gregory, the deceased?

"A. He was brought into McGee on April 12th last year—his remains were, and there were some parties thereon to take the body out, and they wanted me to examine the body and I told them to carry him around to the house, and so I took him out of the casket and undressed him and I examined the body there that afternoon—that was the last time I saw him.

"Q. What did you find in that examination?

"A. I found a considerable bruise on the right side of the body with a small bruise on the leg. It was this bruise on the body that they wanted to know something about. I took my knife and cut down through the flesh to see if the flesh was injured through the body. Well it was an easy matter to see that the bruise reached clear through the flesh.

"Q. You cut into this bruised place?

"A. Yes, sir.

"Q. How did that bruise appear on the surface?

"A. It had more of a greenish appearance than anything else I could compare it to.

"Q. What would you say of the wound you examined in that region of its likelihood of producing death?

"A. It was my opinion that the man died from the injury of the wound over the liver there, which produced a slight break in the liver substance that caused him to bleed to death internally or he died from shock caused by wound over the liver. That word 'shock' is one you hear often among surgeons and know little about—generally result from some unknown cause.

"Q. From the examination thus made of the injury, its location in the body over the liver and gall bladder, what would you say as to its likelihood of causing death?

"A. I would say he died from shock from the injury to the liver.

"Q. Is that considered by you as an expert, as a fatal accident?

"A. Yes, sir. The liver is supplied by the vagarious nerves, incidentally the stomach and supplies a small portion of the kidneys and also the small bowels, and an injury over the liver would give you a reflexion that would put the heart out of business, and the application of the heart to blood supply would be another direct shock to the heart.

"Q. Tell the court what in your judgment produced death?

"A. Shock from injury to the liver from my examination and things I saw and observed in making the examination."

Crawford Black, L. Z. Fitzgerald, H. M. May, L. E. Estess each testified that the deceased, from the time of the accident to the time of his death continually complained of pain in his right side.

From this testimony we feel certain that deceased died from the effects of the injury received in his right side when he fell at or near the switch which he was attempting to throw.

Defendant insists that deceased's fall was caused by his intoxication.

On this point Crawford Black, the conductor of the train, testified (pages 3, 6, 7, 12, 14):

"Q. Tell the court how that injury occurred?

"A. Well, we came out with a load of logs and he got off there at the switch to throw the switch he fell—when he stepped off the sway-bar of the train and the train was moving, the sway-bar is three or four feet from the ground and when he stepped off he fell and fell over the head-block of the switch-block.

"Q. What was the nature of the weather that day—good or bad?

"A. It was raining that day.

"Q. Did you, as conductor, order him to throw the switch?

"A. I told him to get off and throw the switch.

"Q. When Mr. Gregory fell, what happened?

"A. When he fell he got up and threw the switch and come walking on back to where I was at I guess thirty or forty

yards—may be fifty yeards. Some one said that he fell again, but I didn't see him because I went in to make the coupling, and when I saw him he was lying on the ground. I asked him what was the matter and he said that when he got off he fell and hurt his side.

"Q. At the time you discovered that Gregory was hurt?

"A. He told me that he was hurt and said that he was hurt in the side. I pulled his shirt open and there was a bruised place on his side.

"Q. Did you see the bruised place on his side?

"A. Yes, I saw it and he told me that when he fell over the head block he hurt it.

"Q. Mr. Black, as conductor on that train did you consider Mr. Gregory able on that day to perform his duties as a brakeman?

"A. Yes, sir.

"Q. Mr. Black, what was the condition of Gregory at the time he was injured on your train—what was his physical condition?

"A. Mr. Gregory was drinking but he had only taken two drinks of whiskey and I don't think he was drunk.

"Q. Did he show any signs of drunkenness.

"A. He did not.

"Q. What about his movements?

"A. He did not show any signs of having drunk any whiskey.

"Q. What was his condition as compared to any other time when he was not drinking?

"A. He semed to me that he was as himself—he got on the train with me.

"Q. Isn't it a fact that he was vomiting when you carried him to the sand house and that the stuff that he vomited had a very bad whiskey odor?

"A. No, sir, he was not.

"Q. Did Mr. Gregory take drinks occassionally or not?

"A. No, sir, he hardly ever drank.

"Q. He was not drunk was he—was he or not drunk at the time he fell?

"A. No, sir, he was not.

"Q. Please tell the court how this accident happened, where the deceased got off the train, and everything about it?

"A. He got off the train at the rear end of the train. We had ten cars of logs and he and I were riding on the load of logs. I got off to make the coupling and he went on and got off at the switch and when he got off—stepped off the sway-bar, which was three or four feet from the ground, he fell over the head block of the switch block.

"Q. Did he lie there?

"A. He got up and threw the switch and came back towards where I was, and when I came out from coupling the cars he was lying on the ground, and I asked him what was the matter and he said that he fell and hurt himself."

L. E. Fitzgerald, fireman on the locomotive, testified:

(Page 24):

"Q. He was on the rear end of the train?

"A. Yes, sir.

"Q. What was he doing the last time you saw him before you saw him on the ground?

"A. He was on the load of logs.

"Q. Then the next time you saw him he was lying on the ground?

"A. Yes, sir.

"Q. After you saw him on the ground you didn't see him walk any more?

"A. After he run the switch I saw him walking up towards the conductor and then I saw him lying down.

(Page 18):

"Q. Tell the court what he said?

"A. He said he was hurt in the side where he fell across the head block.

(Page 19):

"Q. Now it has been charged here by the defendant that he was drunk at the time which caused him to fall. Tell the court in your own way whether that was true or not?

"A. He wasn't drunk then.

"Q. Do you know whether he was drunk at the time he fell or not?

"A. No, sir, he wasn't drunk.

(Page 20):

"Q. When you first saw that bottle containing the whiskey, was it full?

"A. Yes, sir.

"Q. There hadn't been any drunk out of it at that time?

"A. No, sir.

"Q. Now tell the court plainly, yes or no, was Mr. Gregory drunk at the time he fell and got hurt?

"A. No, sir.

"Q. He was not?

"A. No, sir.

"Q. You were with him assisted with him and had observed him and everything?

"A. Yes, sir.

"Q. Was there anything different to lessen his capacity at this particular time than any other time you observed him on that work?

"A. No, sir.

"Q. During the drinking there did you observe who took the biggest drinks?

"A. I expect I took more than any of them.

"Q. Did it make you drunk?

"A. No, sir.

"Q. Who else drunk out of the bottle besides you and Gregory?

"A. A couple of more fellows drunk out of it.

"Q. How did their drinking in quantity compare with the amount Gregory drunk?

"A. More.

"Q. Neither Mr. Gregory or any of the people drinking with him were intoxicated?

"A. Not that I could tell.

"Q. You know a drunk man when you see him?

"A. Yes, sir.

"Q. If Gregory or either of those men had been drunk you would have known it?

"A. Yes, sir.

"Q. Did their drinking in any way lessen their capacity to discharge their duties?

"A. No, sir.

"Q. They took two little drinks apiece and went on with their work.

"A. Yes, sir.

"Q. What was the condition of the track at that time, as to whether it was slick, dry or how?

"A. It was wet.

(Page 22):

"Q. Then what was done with him after he went from the sand house?

"A. We carried him to his bed over to the boarding house.

"Q. Who carried him?

"A. I carried him and Red Estess carried him part of the way.

"Q. What was his condition then with reference to being drunk or sober?

"A. He was sober.

"Q. Was he or not suffering?

"A. He was suffering.

"Q. Where did he complain of suffering?

"A. In his side."

H. M. May, a member of the train crew, testified, page 27.

"Q. Tell the court what his condition was as to sobriety or drunkenness?

"A. He was just complaining of his side.

"Q. Can you tell the way a man talks and the way a man looks whether he is drunk or not?

"A. I don't think he was drunk. .

(Page 28):

"Q. Did he talk like a sober man?

"A. Yes, sir.

(Page 29):

"Q. Did that stuff that he vomited have a pretty bad odor?

"A. It smelled of medicine."

L. E. Estess, the regular conductor of the log train, but not in charge on the day of the accident, testified, page 31.

"Q. What caused his suffering, if you know?

"A. I don't know, only what he told me, he told me that he fell and got hurt.

"Q. Did you know on what part of his body he was suffering?

"A. He said it was in his side.

(Page 34):

"Q. When did you next see Gregory?

"A. I saw him the next morning about six o'clock.

"Q. What was his condition when you saw him then?

"A. He said 'I feel a little better but I am awful sore'. .

(Page 35):

"Q. You did carry him part of the way from the sand house over to the boarding house?

"A. Yes, sir; he seemed to be suffering so much that we did not ask him to walk.

(Page 36):

"Q. Now as a matter of fact you know that he had the appearance of being a drunk man?

"A. No, sir."

The only testimony in support of defendant's contention that the deceased was drunk at the time of the accident is the testimony of Dr. J. A. Joyner who gives it as his expert opinion that the deceased was drunk. But Doctor Joyner did not see the deceased until after he was hurt, and bases his opinion on the evidence that appealed to him as an expert.

He testifies, (page 44):

"Q. Could you state whether he was drunk or intoxicated?
"A. I would say that he was under the influence of whiskey.
(Page 46):
"Q. Did you or did you not smell the odor of ammonia?
"A. Certainly I did.

(Page 47):

"Q. Now you have testified that in your opinion this man was killed by alcoholic poisoning. What is the symptoms of alcoholic poisoning?
"A. Vomiting, weakness of the heart, difficult breathing.
"Q. Did you ever see anybody vomit, doctor, who did not have alcoholic poisoning?
"A. Yes, sir.
"Q. Vomiting is not a sure test then of alcoholic poison?
"A. No, sir.
"Q. You have seen people vomit who never touched liquor?
"A. Yes, sir.
"Q. That is not an infallible sign of alcoholic poisoning then?

"A. No, sir.
"Q. Neither is nervousness an infallible sign?
"A. No, sir.
"Q. If a man who has had a severe fall or a bruise caused by a piece of timber striking him in the side over and in the region of the liver and gall bladder and the circulation of the heart, would not that make a man sick at the stomach?
"A. Certainly would.
"Q. If these facts be true then the symptoms would be natural under the circumstances of that kind of a hurt?
"A. Yes, sir.
"Q. Isn't it also a fact, doctor, that in certain injuries affecting the natural vitals it makes a man sick and nervous, even disqualifying him from locomotion even though his legs are sound?
"A. Yes, sir.
"Q. If this man received a severe fall on a piece of timber on which he fell that bruised him through to the abdominal region over the liver, heart and gall bladder, isn't it a physiological certainty that the man will become very nervous and sick at the stomach?
"A. Yes, sir."

From all of the above testimony we are unable to say that the judge of the lower court, who knew the witnesses and heard them testify, erred in holding that there was not sufficient evidence to warrant the court in finding that the fall of the deceased was caused by his intoxication.

It is therefore ordered, adjudged and decreed that the judgment of the lower court be affirmed with costs.